# FOR PUBLICATION



ATTORNEYS FOR APPELLANTS:

**DANIEL H. PFEIFER**
**DOUGLAS E. SAKAGUCHI**
Pfeifer Morgan & Stesiak
South Bend, Indiana

ATTORNEY FOR APPELLEE:

**MARK D. ULMSCHNEIDER**
Steele, Ulmschneider, & Malloy LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| W.D., a minor by his parents R.D. and S.D., and R.D. and S.D., individually, | ) ) ) | |
| Appellants, | ) ) | |
| vs. | ) ) | No. 20A05-1112-CT-698 |
| CITY OF NAPPANEE, | ) ) | |
| Appellee. | ) ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Stephen Bowers, Judge
Cause No. 20D02-1006-CT-00012

**June 6, 2012**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

W.D., by his parents S.D. ("Mother") and R.D. ("Father"), and Mother and Father, individually, filed a complaint in Elkhart Superior Court alleging that the City of Nappanee ("the City") breached its duty of care to W.D., which proximately caused injuries suffered at the City's pool. The City filed a motion for summary judgment and argued that it did not breach its duty of care to W.D. as a matter of law. The trial court granted the motion and W.D., Mother, and Father appeal the trial court's entry of summary judgment in favor of the City and the resulting dismissal of their complaint.

We affirm.

## Facts and Procedural History

On June 24, 2009, Mother took her five-year-old son, W.D., his eight-year-old sister, R.D., and a friend to the City pool. The family had visited the pool on several occasions and W.D. had taken swimming lessons there, but W.D. had only limited swimming skills.

Mother and the children arrived at the City pool at approximately 11:00 a.m. Mother did not enter the pool area, but sat outside the fenced area of the pool. It was a very warm day and there were approximately 120 swimmers in the pool. W.D. stayed in the shallow area of the pool where he would bob in the water, blow bubbles with his face in the water, and jump off the side of the pool into the water.

After the children had a picnic lunch, they returned to the pool. Mother proceeded to the registration counter of the pool to sign the children up for swimming lessons. As a result, Mother's view of the pool was obstructed. W.D. and R.D. were playing in the

2

shallow end of the pool when W.D. told R.D. that he wanted to watch her jump off of the diving board.

R.D. could see W.D. from the area near the diving board. She jumped off the diving board one time, checked on W.D. and observed that he seemed to be fine. As she walked up to the diving board to jump off a second time, she noted that W.D. was still in the shallow end of the pool and appeared to be fine. After her second dive, R.D. walked toward the shallow end of the pool and saw W.D. floating face down in the water near the edge of the pool.

At approximately the same time, lifeguard Mitchell Anthony ("Anthony") observed W.D. floating face down in the water. Anthony and the other three lifeguards at the pool that day were certified lifeguards and had undergone Red Cross training. The lifeguards were taught to visually scan the pool from one side of their area to the other taking approximately ten seconds to perform one scan. The lifeguards were instructed to watch for signs of swimmer distress including no movement, bobbing up and down, and flailing hands. Because children would often take part in "hold their breath competitions" or would practice holding their breath face down in the water, upon observing a child floating face down in the water, they would scan back to the child for a second look to determine whether the child was playing or in need of assistance. Appellant's App. pp. 103-04, 113.

After Anthony first observed W.D. floating face down, he continued to scan his area of the pool. When he scanned back to W.D. and saw that he was still face down in the water, he immediately jumped down from his lifeguard chair, reached W.D. as

3

quickly as possible, and pulled him from the water onto the pool deck. Lifeguard Kaitlin Kirkdorffer ("Kirkdorffer") also realized that W.D. was in distress, and blew her whistle two times to let the other swimmers know they needed to exit the pool.

Kirkdorffer then ran over to W.D., and checked his airway, breathing, and circulation. After determining that his airway was not blocked, but that he was not breathing and had no pulse, she gave W.D. two rescue breaths. Kirkdorffer checked his vital signs again, and after detecting no vital signs, she began CPR. After the second round of CPR, W.D. began to cough. Kirkdorffer then sat W.D. up so that he could expel any water that was in his lungs, and W.D. began breathing on his own. EMTs arrived shortly thereafter and W.D.'s care was transferred to them.

On April 14, 2010, W.D., by his parents, and Mother and Father individually ("collectively W.D."), filed a complaint against the City.[1] The City later filed a motion for summary judgment arguing that they had not breached their duty of care to W.D., and therefore, W.D. was not entitled to any recovery on his negligence claim. In support of its motion, the City designated deposition testimony from W.D.'s sister, R.D., lifeguards Anthony and Kirkdorffer, and the pool manager, and Mother's answers to the City's interrogatories. W.D. filed a response to the City's motion and with that response designated to the trial court only the pool's incident report.

On November 15, 2011, the trial court issued its order granting the City's motion for summary judgment and dismissing W.D.'s complaint. Specifically, the trial court determined that the parties' designated evidence "fail[s] to establish a breach of the

---

[1] A copy of the complaint is not included in the record on appeal.

[City's] duty to use reasonable care to protect [W.D.] from drowning. . . . All the undisputed facts support that the lifeguards were maintaining a proper lookout and that prompt and appropriate action was taken." Appellant's App. p. 14.

> Anthony estimated that between scans, W.D. could not have been face down in the water for more than thirty (30) seconds. Lifeguard Kaitlin Kirkdorffer confirmed the brief time frame, noticing the change in [W.D.'s] condition (him lying face down in the water) at almost the same time as Anthony. Immediately, Lifeguard Anthony sprang into action, reaching W.D. in mere seconds, where, with the help of lifeguard Kirkdorffer, effectuated a successful rescue of [W.D.] from the water, saving his life. What more the City of Nappanee's lifeguard staff could have done to protect [W.D.] is hard to fathom.

Id. W.D. now appeals the trial court's entry of summary judgment in favor of the City.

## Standard of Review

W.D. argues that the trial court erred by granting summary judgment to the City on his negligence claim. Our standard of review for a trial court's grant of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. Mangold, 756 N.E.2d at 973. Our review of a summary judgment motion is limited to those materials designated to the trial court. Id. "The party seeking summary judgment has the initial burden of proving the absence of a genuine issue of material fact as to an outcome-determinative issue." Kroger Co. v. Plonski, 930 N.E.2d 1, 8 (Ind. 2010). The nonmovant must then come forward with contrary evidence demonstrating the existence of genuine factual issues that should be

5

resolved at trial. Jarboe v. Landmark Cmty. Newspapers of Ind., Inc., 644 N.E.2d 118, 123 (Ind. 1994). We must carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. Mangold, 756 N.E.2d at 974.

**Discussion and Decision**

To prevail on a claim of negligence the plaintiff must show: (1) duty owed to the plaintiff by defendant; (2) breach of duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by defendant's breach of duty. Kroger, 930 N.E.2d at 7. With regard to the "duty" element, the City does not dispute that it owed a duty to W.D. It is well established that governmental units have a "duty to maintain a public recreational facility in a reasonably safe manner" and owe a duty to private individuals to use ordinary and reasonable care under the circumstances. Benton v. City of Oakland City, 721 N.E.2d 224, 233 (Ind. 1999); see also Putnam Cnty. Sheriff v. Price, 954 N.E.2d 451, 454 (Ind. 2011).

But the City argued, and the trial court agreed, that under these circumstances, the City did not breach its duty of ordinary and reasonable care to W.D.

> Although the existence of duty is a matter of law for the court to decide, a breach of duty, which requires a reasonable relationship between the duty imposed and the act alleged to have constituted the breach, is usually a matter left to the trier of fact. Only where the facts are undisputed and lead to but a single inference or conclusion may the court as a matter of law determine whether a breach of duty has occurred.

Id. at 9 (citing Mangold, 756 N.E.2d at 975). W.D. argues that whether the lifeguards acted reasonably under the circumstances is a genuine issue of material fact, and therefore, the trial court improperly granted the City's motion for summary judgment.

6

The City designated evidence that the pool area was adequately staffed by trained lifeguards. There were four lifeguards on duty that day. Three lifeguards sat in lifeguard chairs and one lifeguard walked the pool area. The City designated evidence from Anthony's and Kirkdorffer's depositions to establish that the lifeguards were certified and had Red Cross training.

The City's designated evidence also leads to the conclusion that W.D. was floating face down in the pool for approximately thirty seconds before he was removed from the pool by lifeguard Anthony. Both lifeguards testified that they were trained to and had been scanning the pool area in ten second sweeps. Anthony testified that he observed W.D. floating face down, and as he was trained to do, performed another ten-second scan of the pool before taking a "second look" at W.D. After seeing that W.D. was still floating face down, Anthony jumped into the pool, removed W.D. from the water and placed him on the pool deck. Lifeguard Kirkdorffer realized W.D. was in distress within a second or two of Anthony and blew her whistle twice to remove the other swimmers from the pool.

Kirkdorffer then checked W.D.'s vital signs, and started CPR. After the second round of CPR, W.D. coughed, and Kirkdorffer sat him up so that any water in his lungs would be expelled. Thereafter, W.D. began breathing on his own. Kirkdorffer's training and immediate action saved W.D.'s life.

W.D.'s sister's testimony similarly established that W.D. had been floating face down for less than thirty seconds. She testified that W.D. was fine right before she

7

jumped off the diving board. After her jump, R.D. got out of the pool and walked toward the area where W.D. had been and saw him floating face down.

Our court has previously stated that a lifeguard owes a duty to help imperiled swimmers, but the lifeguard "cannot possibly be an absolute insurer of the safety of swimmers." Plummer v. Bd. of Com'rs of St. Joseph County, 653 N.E.2d 519, 523 (Ind. Ct. App. 1995), trans. denied. The City's undisputed designated evidence establishes that the lifeguards exercised ordinary and reasonable care under the circumstances, and therefore, they did not breach their duty to W.D. W.D. was briefly imperiled before the lifeguards realized that he needed assistance. The City's lifeguards then quickly removed W.D. from the pool and saved his life.

Although our courts rarely determine whether a breach of duty occurred as a matter of law, this case represents one of those rare exceptions. Because the record lacks any designated evidence of disputed factual questions that would preclude the entry of summary judgment in this case, we affirm the trial court's entry of summary judgment in favor of the City and its dismissal of W.D.'s complaint.

Affirmed.

ROBB, C.J., and BAILEY, J., concur.